UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN FINKELSTEIN, et al., | Case No. 18-cv-00009-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART CICHOCKI'S MOTION FOR SUMMARY JUDGMENT** |
| SAN MATEO COUNTY DISTRICT ATTORNEY'S OFFICE, et al., | |
| Defendants. | Docket Nos. 111, 118 |

Plaintiffs John and Jennifer Finkelstein filed a § 1983 civil rights action based on a search that the police conducted of their home and cars in January 2016. The search was for child pornography, predicated on the suspicion that Mr. Finkelstein had been involved in a sexual incident with a female minor on Skype. Defendants in the case are:

(1) Jeffrey S. Cichocki, a detective with the Loudoun County (Virginia) Sheriff's Office. Officer Cichocki was the officer who first investigated the incident.

(2) The City of San Mateo and Nicolas Ryan, a detective with the San Mateo Police Department (collectively, the "City Defendants"). Officer Ryan assisted Officer Cichocki in the investigation and submitted the application in support of the search warrant to a California superior court judge.

(3) The San Mateo County District Attorney's Office and Vishal Jangla, a deputy D.A. (collectively, the "County Defendants"). D.D.A. Jangla was the prosecutor who reviewed the search warrant application before it was submitted to the state court judge.

Previously, both the Finkelsteins and the County Defendants (but no other parties) filed motions for summary judgment. The Court granted the Finkelsteins' motion which sought only a limited adjudication that there was no probable cause on the face of the search warrant application. The Court denied the County Defendants' motion which included arguments that D.D.A. Jangla had qualified immunity with respect to the claims for (1) lack of probable cause and (2) judicial deception. *See* Docket No. 104 (order).

Subsequently, D.D.A. Jangla filed a notice of appeal to the Ninth Circuit, challenging the Court's summary judgment rulings on qualified immunity. *See* Docket No. 106 (notice of appeal). Based on D.D.A. Jangla's appeal, the County Defendants filed a motion to stay proceedings against them. The Court granted the motion to stay and further held that it would stay all proceedings in the case, except that it would first rule on the motions for summary judgment that had been filed by the remaining defendants, *i.e.*, the City Defendants and Officer Cichocki.

Currently pending before the Court are the motions for summary judgment filed by the City Defendants and Officer Cichocki. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part both motions.

## I.     FACTUAL & PROCEDURAL BACKGROUND

The evidence submitted by the parties reflects as follows. (Where there are disputed facts, they are so noted.)

In January 2016, the Finkelsteins' home and cars were searched pursuant to a warrant that was issued by the San Mateo County Superior Court. The state court judge approved the warrant based on an affidavit submitted by Officer Ryan of the San Mateo Police Department ("SMPD").

The events leading up to the search warrant application were as follows.

In November 2015, Officer Cichocki, a detective with the Loudoun County (Virginia) Sheriff's Office, "was assigned to investigate a child pornography and exploitation case involving a fourteen year old girl in Loudoun County." Cichocki Aff. ¶ 7. Nude pictures of the girl had been taken by a person with whom she was engaging via Skype. *See* Cichocki Aff. ¶ 10.

Officer Cichocki conducted an investigation, which included the service of an

administrative subpoena on Skype.  Based on the response to the subpoena, he learned that "[1] the suspect's Skype account was created on August 16, 2015; [2] the email address used to register the account was 'johnrob@gmail.com'; and [3] the account was created from an IP address purportedly originating from Namibia, Africa."  Cichocki Aff. ¶ 11.

Through additional administrative subpoenas, Officer Cichocki learned that the email address johnrob@gmail.com belonged to Mr. Finkelstein and that Mr. Finkelstein lived in San Mateo, California.  *See* Cichocki Aff. ¶ 20.  From social media, Officer Cichocki learned that "Mr. Finkelstein had a computer science degree from Stanford University and was currently employed as a senior software engineer for a tech company in San Mateo."  Cichocki Aff. ¶ 21.

Thereafter, Officer Cichocki met with his supervisor to ask for clearance to reach out to the SMPD "for assistance with obtaining a search warrant of Mr. Finkelstein's electronic devices."  Cichocki Aff. ¶ 22.  The supervisor reviewed Officer Cichocki's investigation materials and approved the request.  *See* Cichocki Aff. ¶ 22.

Officer Ryan of the SMPD was tasked with assisting Officer Cichocki.  Officer Cichocki provided Officer Ryan with his investigation materials as well as an affidavit he authored to assist Officer Ryan in getting a search warrant.  *See* Cichocki Aff. ¶ 24.  The two officers communicated on multiple occasions; Officer Ryan did his own additional investigation as well.

According to Officer Ryan, part of his additional investigation was to visit the Skype website.  On the website, there was a section titled: "How do I create a Skype account?"  Ryan Decl., Ex. C (Skype webpage).  Below that question, Skype stated:

> If you don't have a Skype account yet, it's easy to get started.
>
> 1. Download and install Skype if you haven't already done so.
>
> 2. Start Skype and click **Create an account** (or go directly to the Create an account page).
>
>    [Picture omitted.]
>
>    The 'Create an account or sign in' page opens in your web browser.
>
> 3. Enter your details on the page:

- **Use a valid email address.** You'll need it to sign in. We also use it to send you important information about Skype and any purchases you make.

- **Choose a Skype Name.** . . .

- **Choose a password.** . . .

4. Read the Skype Terms of Use and the Skype Privacy Policy, and then click **I agree – Continue**.

You've now created a Skype account.

Ryan Decl., Ex. C (webpage) (emphasis in original).

After reviewing the Skype website, Officer Ryan suggested to Officer Cichocki that the search warrant affidavit should use language to match the language on the website – *i.e.*, so that the affidavit would "be more accurate in the description of what Skype required to create an account." Ryan Decl. ¶ 10. Officer Ryan therefore did not use the following language that was contained in Officer Cichocki's affidavit: "'Skype requires authorization through a working email address in order to be accessed. [The suspect] had a registered email of johnrob@gmail.com.'" Ryan Decl. ¶ 10. Instead, in its place, Officer Ryan used the following language: "'**In order to create a Skype account a valid email address is necessary. The email address used to create this account was johnrob@gmail.com.**'" Ryan Decl. ¶ 10 (emphasis added).

The Finkelsteins challenge Officer Ryan's claim that he looked at the Skype website and relied on language therefrom in preparing the search warrant application. Officer Ryan admits that, when he first testified during the state court proceedings about the events at issue,[1] he did not remember visiting the Skype website or talking to Officer Cichocki about changing the affidavit based on the language on the website. But, according to Officer Ryan, in May 2016, while the state court proceedings were still ongoing, Officer Cichocki sent him an email about their prior conversation, and the email refreshed his recollection about what had taken place – *i.e.*, that he had visited the Skype website. *See* Ryan Decl. ¶¶ 11, 13 & Ex. D (email from Officer Cichocki, dated May 2016).

The search warrant affidavit that Officer Ryan eventually gave to the state court judge for

---

[1] The state court proceedings arose when Mr. Finkelstein sought the return of his property that had been seized.

4

review included the above change – *i.e.*, the statement that "'[i]n order to create a Skype account a valid email address is necessary. The email address used to create this account was johnrob@gmail.com.'" Ryan Decl. ¶ 10. But before submitting the affidavit to the judge, Officer Ryan first "sent it to Sgt. Sean Pierce of the Silicon Valley ICAC [Internet Crimes Against Children] for review." Ryan Decl. ¶ 15. Officer Ryan also gave the affidavit to D.D.A. Jangla for his "review and approval." Ryan Decl. ¶ 16. Neither Sgt. Pierce nor D.D.A. Jangla indicated that there was any problem with probable cause. *See* Ryan Decl. ¶¶ 15, 17. In addition, neither Sgt. Pierce nor D.D.A. Jangla ever indicated that "'valid email address' on Skype's website could mean 'valid' as to form only, or that Skype did not do anything to check whether email addresses used to create accounts were 'valid,' or that a person could use a fake or made up email address to create a Skype account." Ryan Decl. ¶¶ 15, 17; *see also* Ryan Decl. ¶ 20.

According to Officer Ryan, at the time he drafted the search warrant application, he did not know that "a person could provide someone else's email to set up a Skype account." Ryan Decl. ¶ 18. He also did not know that "there was a difference between a 'valid' email and a 'verified' or 'validated' email." Ryan Decl. ¶ 19. Officer Ryan "assumed that 'valid' meant Skype had some process to make sure email addresses were 'valid.' . . . [He] did not know 'valid' could refer to the proper format of an email address such as abc@xyz.com."[2] Ryan Decl. ¶ 21. Officer Ryan asserts that his assumption was reasonable given, *inter alia*, that he "had not received specific formal training in Internet Crime Investigations or formal training specific to internet service providers and the information they collect or how to obtain it." Ryan Decl. ¶ 3; *see also* Edens Decl. ¶¶ 6-8 (testifying that (1) "[i]n California, the basic police academy teaches prospective law enforcement officers the basic foundational principles of police work" but training "does not include [e.g.]

_____

[2] Officer Ryan has thus positioned himself differently from D.D.A. Jangla. During the state court proceedings, D.D.A. Jangla testified that he knew a "valid" email was simply one that was in the right format: "It's got to have a dot." Docket No. 70-1, at 43 (Merin Decl., Ex. D) (Tr. at 25). D.D.A. Jangla also testified that he did not understand "valid" to mean verified or validated – i.e., where, "once you enter an e-mail address, they would then take the next step of . . . sending an e-mail to that address [a]nd within that e-mail, they would have a unique link that you would need to click on" such that the sender "would . . . be able to verify or validate that whoever entered that e-mail address actually had access to that e-mail account." Docket No. 70-1, at 43 (Merin Decl., Ex. D) (Tr. at 25).

internet crime investigations"; that (2) there were "two foundation specialty courses, Child Abuse

Investigations or Computer Crimes," where training would be given in technology-based

investigations but "an officer would not be enrolled in these foundation specialty courses unless

his or her primary investigative assignment was child abuse or computer crime"; and that (3)

before 2017, "technology-based investigations were not taught at the California POST ICI Core

course meant for new investigators"). Officer Ryan also maintains that his understanding of

"valid" was bolstered by a conversation that he had had with Officer Cichocki. At one point prior

to the submission of the search warrant application, he asked Officer Cichocki

> why he believed that John Finkelstein was the person that set up the "johnrobbins6" Skype account. In response, Officer Cichocki [said] that he had set up a Skype account and Skype sent him an email after he created the account. To [Officer Ryan] this was consistent with the information contained on Skype's website that a valid email address was needed to create a Skype account.

Ryan Decl. ¶ 12.

As for Officer Cichocki, he claims that, at the time of the search warrant application, he

did not know that "a person could successfully create a Skype account by providing a false or

made up email address." Cichocki Aff. ¶ 31. Officer Cichocki understood the directive on

Skype's website, "'Use a valid email address,'" to mean that "the person registering a Skype

account needed to use a working email in order to open and access Skype," Cichocki Aff. ¶ 25 –

"*e.g.*, one that receives emails and is actually attached to a person." Cichocki Aff. ¶ 12. Unlike

Officer Ryan, however, Officer Cichocki does not claim that he thought "valid" meant "validated"

or "verified." In this regard, the Court notes that, unlike Officer Ryan, Officer Cichocki seems to

have had experience with technology-based investigations. *See* Cichocki Aff. ¶ 6 (testifying that,

"[a]t the time of the criminal investigation and execution of the search warrant at issue in this

lawsuit, namely November 2015-January 2016, I was a part-time officer with the Child

Exploitation Task Force Division of the FBI"; he "worked hand in hand with federal agents to

assist them locally with the investigation of child sex crimes in Loudoun County"); *see also*

Cichocki Aff., Ex. A (reflecting training in child exploitation and crimes against children).

Ultimately, Officer Ryan provided the following information to the state court judge in his

search warrant affidavit:

- The victim was "contacted by an unknown subject on an application called MyLOL where she was sent a message by a user with the profile name 'Peter Mayfair.' The profile picture for this user was of a juvenile male with the stated birthday of (01/03/1999)." Ryan Decl., Ex. E (Ryan Aff. at 4). "MyLOL is a teenager social networking/dating website." Ryan Decl., Ex. E (Ryan Aff. at 5).

- The suspect asked the victim to Skype him, and she eventually agreed. "The suspect's Skype profile name was 'johnrobbins6.'" Ryan Decl., Ex. E (Ryan Aff. at 5). The profile also indicated that he was from London, England. *See* Merin Decl., Ex. A (Ryan Aff. at 5).

- The suspect asked the victim for video via Skype, and "she used the video feature 2 or 3 times, but only spoke via text on Skype." Ryan Decl., Ex. E (Ryan Aff. at 5). The suspect used the video feature but one time only, and the video simply "showed a still image of a white juvenile male with brown hair." Ryan Decl., Ex. E (Ryan Aff. at 5). The victim never saw the suspect, nor did she ever hear his voice. *See* Ryan Decl., Ex. E (Ryan Aff. at 5).

- The suspect asked the victim to show her breasts and genitalia via Skype video and she did so. After she did so, the victim told the suspect she was leaving the chat and the suspect threatened her, saying, *e.g.*, "'I showed u a video that's not even me' [and] 'u will do exactly what I say and beg me or I will share this video on the internet.'" Ryan Decl., Ex. E (Ryan Aff. at 5). The suspect told the victim that "he used a proxy server so he could not be traced, he had her phone number[] and IP address, and he could find where she lived." Ryan Decl., Ex. E (Ryan Aff. at 5).

- Through an administrative subpoena on Skype, the police learned that the account for "johnrobbins6" was created in August 2015 from an IP address in Namibia, Africa, "which substantiated the suspect's claim that he was likely using a proxy server." Ryan Decl., Ex. E (Ryan Aff. at 6). The police also learned that, "[i]n order to create a Skype account a valid email address is necessary. The email

address used to create this account was johnrob@gmail.com." Ryan Decl., Ex. E (Ryan Aff. at 6).

- Through an administrative subpoena on Google, the police learned that "[t]he email account johnrob@gmail.com returned to a John Finkelstein and a recovery email address was listed as johnrob@cs.stanford.edu." Ryan Decl., Ex. E (Ryan Aff. at 6). Google also had a phone number listed for SMS. *See* Ryan Decl., Ex. E (Ryan Aff. at 6).

- The police learned that the provider for the phone number was AT&T, and, through an administrative subpoena on AT&T, the police obtained the subscriber information for the phone number. AT&T identified the subscriber as John R. Finkelstein with an address in San Mateo. *See* Ryan Decl., Ex. E (Ryan Aff. at 6).

In January 2016, a San Mateo superior court judge signed off on the search warrant application submitted by Officer Ryan. *See* Ryan Decl., Ex. E (Ryan Aff. at 2). Subsequently, a search of the Finkelsteins' home and cars (for child pornography) was conducted. Ultimately, nothing was found, and Mr. Finkelstein was never charged with any crime.

Thereafter, Mr. Finkelstein filed a motion in state court, challenging the search warrant and asking for a return of the property seized from him during the search. In October 2017, the superior court judge who signed off on the warrant issued an order on the motion which was favorable to Mr. Finkelstein.

- *Judicial deception.* The judge found that the following statement from the Ryan affidavit in support of the search warrant was made in reckless disregard for the truth: "'In order to create a Skype account a valid email address is necessary. The email address used to create this account was 'johnrob@mail.com.'" Docket No. 70 (Merin Decl., Ex. E) (Order at 4). According to the judge, the statement "was included in the affidavit in an attempt to establish a connection between the illegal conduct involving the Virginia minor and Mr. Finkelstein, and, therefore, the meaning intended by the phrase 'used to create this account' was that the owner of the email account 'used' the email account in a manner involving control over the

8

email account by the owner." Docket No. 70 (Merin Decl., Ex. E) (Order at 3-4); *see also* Docket No. 70 (Merin Decl., Ex. E) (Order at 4-5) (stating that "[a]n email account is commonly understood to be 'used' when an email message is either drafted and sent or an email message is received and reviewed[;] [w]hile using email may further include organizing such messages, using email does not include solely *informing* a person or a company of an email address") (emphasis in original). But "the email address was not 'used' but instead was simply included along with other requested information by the individual who created the Skype account and had no reason to supply any accurate information." Docket No. 70 (Merin Decl., Ex. E) (Order at 4). Once the "reckless, material misstatement of fact" was excised, the remaining statements were insufficient to establish probable cause. *See* Docket No. 70 (Merin Decl., Ex. E) (Order at 4).

- *Lack of probable cause.* The judge also found that, even if it were to interpret the misleading statements "in the manner consistent with the meaning the detectives" advocated, there was still no probable cause. Docket No. 70 (Merin Decl., Ex. E) (Order at 5). The affidavit "simply showed that Mr. Finkelstein's email address was provided along with other misinformation when the Skype account was created. Anyone could have randomly provided his email address during the creation of the Skype account. Consequently, the affidavit failed to establish probable cause." Docket No. 70 (Merin Decl., Ex. E) (Order at 5).

## II. DISCUSSION

A. Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a defendant moves for summary judgment based on an affirmative defense (*i.e.*, an issue on which it bears the burden of proof), the defendant must establish "all of the essential elements of the . . . defense to warrant judgment in [its] favor." *Martin v. Alamo Cmty. College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (internal quotation marks omitted; emphasis omitted); *see also Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (noting that a defendant bears the burden of proof at summary judgment with respect to an affirmative defense).

But where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only by pointing to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

B.   Causes of Action

In the instant case, the City Defendants and Officer Cichocki seek summary judgment on all claims asserted against them. The Finkelsteins' claims are as follows:

(1) Judicial deception (individual defendants only).

(2) Use of untrustworthy information to establish probable cause (individual defendants only).

(3) Use of untrustworthy information to procure a warrant (City only).

(4) Use of a search warrant application lacking probable cause on its face to procure a warrant (individual defendants only).

(5) Unreasonable search and seizure without a warrant, probable cause, and exigent circumstances (individual defendants only).

As indicated by the above, most of the claims are pled against the individual defendants. In the pending motions, Officer Ryan and Officer Cichocki largely argue that they have qualified immunity.

C.     <u>First Cause of Action – Judicial Deception (Officer Ryan and Officer Cichocki)</u>

As the Court noted in its prior summary judgment order, the Ninth Circuit has stated that, as a general matter, "governmental employees are not entitled to qualified immunity on judicial deception claims," and the reason why is fairly simple:

> "[I]f an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, . . . he cannot be said to have acted in a reasonable manner, and the shield of qualified immunity is lost."

*Chism v. Washington*, 661 F.3d 380, 393 (9th Cir. 2011).

> Therefore, in order for a plaintiff "to survive a defendant officer's motion for summary judgment on the ground of qualified immunity," all that the plaintiff must do is "1) make a 'substantial showing' of deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred." *Liston v. Cty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997). The first element of a judicial deception claim – "a deliberate or reckless false statement or omission – is a question of fact." *Rhabarian v. Cawley*, No. 2:10-cv-00767-TLN-KJN, 2013 U.S. Dist. LEXIS 112189, at *28-29 (E.D. Cal. Aug. 7, 2013); *see also Liston*, 120 F.3d at 974 (stating that, "if the [plaintiffs] make the required 'substantial showing,' the question of intent or recklessness is 'a factual determination for the trier of fact'").

Docket No. 104 (Order at 12).

In the instant case, Officer Ryan and Officer Cichocki primarily argue that the Finkelsteins have failed to make a substantial showing of a deliberate falsehood or reckless disregard for the truth. According to the Finkelsteins, the officers deliberately lied or recklessly disregarded the truth in multiple ways:

(1) By including the following statement in the search warrant application: "In order to create a Skype account a valid email address is necessary. The email address used to create this account was johnrob@gmail.com." *See* Compl. ¶ 9.

(2) By including the following statement in the search warrant application: "Skype's response to this subpoena showed the user name 'johnrobbins6' was an account created on 08/16/2015 and the IP address was from Nambia [sic], Africa (which substantiated the suspect's claim that he was likely using a proxy server)." *See* Compl. ¶ 11.

United States District Court
Northern District of California

(3) By omitting from the search warrant application "the fact that a screenshot of the victim's phone showed the suspect's Skype profile display[ed] the West African [time zone] of GMT+2." Opp'n at 9; *see also* Compl. ¶ 12.

The Court notes that the Finkelsteins seem to have dropped the claim that there was judicial deception because "Defendants CICHOCKI and RYAN also omitted from the RYAN Affidavit a Skype text message from the perpetrator admitting that the Skype account was 'FAKE.'" Compl. ¶ 13. The Finkelsteins asserted this claim in their complaint and both officers challenged the claim in their motions for summary judgment, but the Finkelsteins did not address the claim in their opposition briefs. Thus, for this one judicial deception claim based on ¶ 13 of the complaint, the officers are entitled to summary judgment.

### 1. "Valid" Email "Used to Create" the Skype Account

As noted above, the Finkelsteins' first argument is that the officers deliberately lied or at least recklessly disregarded the truth by including the following statement in the search warrant application: "In order to create a Skype account a valid email address is necessary. The email address used to create this account was johnrob@gmail.com." *See* Compl. ¶ 9. For this argument, the Court differentiates between Officer Ryan and Officer Cichocki because the former, unlike the latter, effectively thought that a "valid" email was a verified one and under the circumstances had reason to do so.

### a. Officer Ryan

As noted above, a judicial deception claim can be based on a deliberate falsehood or a reckless disregard of the truth. With respect to reckless disregard, courts have indicated that this involves an inquiry as to whether there is a "'high degree of awareness of [the statements'] probable falsity. An assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000); *see also United States v. Clapp*, 46 F.3d 795, 801 (8th Cir. 1995) (noting that "[c]ourts, including our own, that have attempted to define reckless disregard for the truth have looked to what the affiant 'believed or appropriately accepted' as true; a number have explicitly

adopted the First Amendment libel standard" – *i.e.*, "whether affiant 'in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein"); *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984) (stating the same).

With respect to the instant case, the question is, in essence, whether it should have been obvious to Officer Ryan that his statement ("In order to create a Skype account a valid email address is necessary. The email address used to create this account was johnrob@gmail.com.") was potentially misleading.[3] Officer Ryan argues that the answer must be "no" because he used the language he did – *e.g.*, "create," "valid," "necessary," and "used to create this account" – based on the language displayed on Skype's website. The website stated: "How do I **create** a Skype account? . . . . **Use** a **valid** email address. You'll **need** it to sign in. We also use it to send you important information about Skype and any purchases you make.'" Ryan Decl., Ex. C (Skype webpage) (emphasis added and omitted).

As noted above, the Finkelsteins challenge Officer Ryan's claim that he relied on the Skype website. They note:

> On March 31, 2016, just two-and-one-half months after the search warrant issued [in January 2016], detective Ryan sent an email to his sergeant and to his lieutenant explaining the judicial deception allegation made against him in the state court proceeding. Therein, detective Ryan explained that his understanding that a valid email address was necessary for the creation of a Skype account came from speaking with the Virginia detective (Cichocki). This email makes *no reference* to the Skype website as the source of the challenged statement.

Opp'n at 6 (emphasis in original); *see also* Merin Decl., Ex. 5 (email from Officer Ryan to sergeant and lieutenant, dated March 31, 2016) ("The defense is attempting to quash the warrant on the grounds I was 'deceptive' in my warrant as I stated a 'valid email address was needed to create a Skype account. In speaking with the Virginia Detective, it was my understanding that a valid email address was necessary for the creation of a Skype account."). The Finkelsteins also point out that, in a declaration submitted to the state court in April 2016, Officer Ryan also did not

---

[3] The Court focuses on reckless disregard as this is an easier standard for the Finkelsteins to satisfy.

United States District Court
Northern District of California

mention the Skype website.  *See* Merin Decl., Ex. 6 (in ¶ 3 of the declaration submitted to the state court, Officer Ryan testifying that "I based [the] statement ['In order to create a Skype account a valid email address is necessary'] on information provided to me by Detective Cichocki, but also believed that the statement was reasonable based on my personal experience in opening accounts on the Internet").  Officer Ryan claims that he simply forgot, at the time of the initial state court proceedings, about the Skype website and that, in May 2016, his recollection was refreshed when Officer Cichocki sent him an email.

If there is, in fact, a genuine dispute of material fact about Officer Ryan's reliance on the Skype website, then summary judgment should not be granted.  But, as noted above, an issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248-49.  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.

The Court finds that there is insufficient evidence on which a jury could reasonably find for the Finkelsteins with respect to Officer Ryan's reliance on the Skype website.  The key language that Officer Ryan used in the statement at issue replicates precisely the language displayed on the Skype website.  The chances of a sheer coincidence are next to nil.  Moreover, although Officer Ryan did not mention the Skype website in his March 2016 email or his April 2016 declaration, nothing in those documents forecloses reliance on the website either.  In addition, Officer Ryan's comments in the email and declaration that his understanding was informed by information provided by Officer Cichocki is consistent with his position that, at some point before he submitted the search warrant application to the state court judge, he asked Officer Cichocki

> why he believed that John Finkelstein was the person that set up the 'johnrobbins6' Skype account.  In response, Officer Cichocki [said] that he had set up a Skype account and Skype sent him an email after he created the account.  To [Officer Ryan] this was consistent with the information contained on Skype's website that a valid email address was needed to create a Skype account.

Ryan Decl. ¶ 12.  His account of that conversation is not disputed.

14

To be sure, even if Officer Ryan did rely on the Skype website, that does not automatically mean that he did not act in reckless disregard of the truth by stating, "In order to create a Skype account a valid email address is necessary. The email address used to create this account was johnrob@gmail.com." For example, Officer Ryan may have used "valid" because that is the term Skype used on its website, but Officer Ryan also made assumptions about what Skype meant by "valid." *See, e.g.*, Ryan Decl. ¶¶ 19, 21 (testifying that he did not know that "there was a difference between a 'valid' email and a 'verified' or 'validated' email" and that he assumed "'valid' meant Skype had some process to make sure email addresses were 'valid'"; he "did not know 'valid' could refer to the proper format of an email address" only). The question is, in effect, whether there was any obvious deficiency with his assumptions that "valid" meant verified. *Cf. Rhabarian v. Cawley*, No. 2:10-cv-00767-TLN-KJN, 2013 U.S. Dist. LEXIS 112189, at *30 (E.D. Cal. Aug. 7, 2013) (noting that "a merely sloppy investigation culminating in a search warrant – without a showing of deliberation or recklessness – will not support a judicial-deception claim"); *see also Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009) (stating that a judicial deception claim may not be based on an officer's erroneous assumptions about the evidence he has viewed); *United States v. Smith*, 588 F.2d 737, 739-40 (9th Cir. 1978) (stating that an officer "made certain erroneous assumptions on the basis of the information he received; but this does not amount to the reckless inclusion of false statements in his affidavit").

There was no obvious problem with Officer Ryan's main assumption about the term – *i.e.*, that a "valid" email is, in effect, a verified one. As Officer Ryan points out, he had not received any special training on technology-based investigations, *see* Ryan Decl. ¶ 3 (testifying that he "had not received specific formal training in Internet Crime Investigations or formal training specific to internet service providers and the information they collect or how to obtain it"), and that was through no fault of his own. *See* Edens Decl. ¶¶ 6-8 (testifying that (1) "[i]n California, the basic police academy teaches prospective law enforcement officers the basic foundational principles of police work" but training "does not include [e.g.] internet crime investigations"; that (2) there were "two foundation specialty courses, Child Abuse Investigations or Computer Crimes," where training would be given in technology-based investigations but "an officer would

15

not be enrolled in these foundation specialty courses unless his or her primary investigative assignment was child abuse or computer crime"; and that (3) before 2017, "technology-based investigations were not taught at the California POST ICI Core course meant for new investigators"). Furthermore, Officer Ryan relied on the opinions of Sgt. Pierce of the Silicon Valley ICAC and D.D.A. Jangla who reviewed the affidavit; he was never informed by either Sgt. Pierce or D.D.A. Jangla (who appeared to be experienced in such matters) that "valid" meant valid as to form only. Concededly, a police officer should not automatically be free from liability simply because he relies on, *e.g.*, the advice of a prosecutor. *Cf. Kelly v. Borough of Carlisle*, 622 F.3d 248, 255-56 (3d Cir. 2010) (in discussing qualified immunity, stating that "'a wave of the prosecutor's wand cannot magically transform an unreasonable probable cause determination into a reasonable one'"); *Cox v. Hainey*, 391 F.3d 25, 35 (1st Cir. 2004) (stating that "the mere fact that an officer secures a favorable pre-arrest opinion from a friendly prosecutor does not automatically guarantee that qualified immunity will follow"). Nevertheless, although "not conclusive, reliance on an attorney's advice is some evidence of good faith," *Dixon v. Wallowa Cty.*, 336 F.3d 1013, 1019 (9th Cir. 2003) (addressing qualified immunity); *cf. Kelly*, 622 F.3d at 255 (stating that, "[i]n our review, encouraging police to seek legal services serves such a salutary purpose as to constitute a 'thumb on the scale' in favor of qualified immunity"), and there is nothing in the record to suggest that Officer Ryan's reliance on D.D.A. Jangla was not objectively reasonable under the circumstances. *Cf. Kelly*, 622 F.3d at 255-56 (in addressing qualified immunity, asking whether officer's reliance on prosecutor's advice was objectively reasonable); *Cox*, 391 F.3d at 35 (asking the same); *see also Dixon*, 336 F.3d at 1040 (noting that factors to consider "in determining whether an officer's reliance on advice of counsel was reasonable" include: "(1) whether the attorney was independent, (2) whether the advice addressed the constitutionality of the proposed action, (3) whether the attorney had all the relevant facts, and (4) whether the advice was sought before or after the officer's action").

The Finkelsteins protest that it should have been obvious that "valid" did not mean verified because the Skype website, in instructing users how to create an account, never stated that there was a verification process. But the Skype website did not foreclose there being a verification

16

1  process either.  At bottom, the Finkelsteins' criticism is that a reasonable officer would have done

2  more than what Officer Ryan did – *i.e.*, a reasonable officer would have gone through the process

3  to set up a Skype account which would have revealed there is no verification.  But a judicial

4  deception claim requires more than simple negligence; there must either be a deliberate falsehood

5  or a reckless disregard of the truth.  Even if Officer Ryan was negligent or grossly negligent in

6  failing to conduct a further inquiry, given his lack of training and his reliance on review by other

7  officials with experience, he did not act intentionally or with reckless disregard of the truth.

8      Accordingly, the Court grants Officer Ryan summary judgment on the judicial deception

9  claim to the extent it is based on the above statement.

10          b.    Officer Cichocki

11      Unlike Officer Ryan, Officer Cichocki does not appear to have been under any

12  misconception that a "valid" email meant a verified one.  *See* Mot. at 10 ("As Det. Cichocki

13  understood it, the word 'valid' was *not* intended to represent a verification process in which Skype

14  would send a code or link to the user.") (emphasis added).  At best, Officer Cichocki claims that,

15  at the time of the search warrant application, he did not know that "a person could successfully

16  create a Skype account by providing a false or made up email address," Cichocki Aff. ¶ 31, and

17  that he understood the directive on Skype's website, "'Use a valid email address,'" to mean that

18  "the person registering a Skype account needed to use a working email in order to open and access

19  Skype," Cichocki Aff. ¶ 25 – "*e.g.*, one that receives emails and is actually attached to a person."

20  Cichocki Aff. ¶ 12.  But use of a working email address is not the same as Skype verifying the

21  email address is the address of the actual user.

22      Nevertheless, Officer Cichocki still contends that it was not an obvious deficiency for him

23  to endorse the statement at issue ("In order to create a Skype account a valid email address is

24  necessary.  The email address used to create this account was johnrob@gmail.com.") because of

25  the language displayed on Skype's website ("Use a valid email address.  You'll need it to sign in.

26  We also use it to send you important information about Skype and any purchases you make.").

27  Ryan Decl., Ex. C (Skype webpage).

28      Similar to above, Skype's language on its website does not automatically insulate Officer

17

1   Ryan from liability.  Instead, the question is whether a reasonable jury could find that it was

2   obvious the statement at issue could be misleading, especially given the context.  As the superior

3   court found, the context presented in the affidavit implied that johnrob@gmail.com was the actual

4   user.  If it had been made clear that the email address johnrob@gmail.com was simply provided to

5   Skype for registration, and nothing more, there would be *no* probable cause to link Mr. Finkelstein

6   to the crime.  As the state court judge observed, the statement at issue "was included in the

7   affidavit in an attempt to establish a connection between the illegal conduct involving the Virginia

8   minor and Mr. Finkelstein, and, therefore, the meaning intended by the phrase 'used to create this

9   account' was that the owner of the email account 'used' the email account in a manner involving

10  control over the email account by the owner."  Docket No. 70 (Merin Decl., Ex. E) (Order at 3-4);

11  *see also* Docket No. 70 (Merin Decl., Ex. E) (Order at 4-5) (stating that "[a]n email account is

12  commonly understood to be 'used' when an email message is either drafted and sent or an email

13  message is received and reviewed[;] [w]hile using email may further include organizing such

14  messages, using email does not include solely *informing* a person or a company of an email

15  address") (emphasis in original).  But, the state court judge noted, "the email address was not

16  'used' but instead was simply included along with other requested information by the individual

17  who created the Skype account and had no reason to supply any accurate information."  Docket

18  No. 70 (Merin Decl., Ex. E) (Order at 4).  Once the "reckless, material misstatement of fact" was

19  excised, the remaining statements were insufficient to establish probable cause.  *See* Docket No.

20  70 (Merin Decl., Ex. E) (Order at 4).

21       Officer Cichocki contends still that D.D.A. Jangla's approval of the search warrant

22  application should insulate him from liability.  But while the advice of the prosecutor was a

23  significant consideration in the analysis of Officer Ryan's culpability, who thought "valid" meant

24  verified, the same is not true for Officer Cichocki.  Officer Cichocki's reliance on D.D.A. Jangla's

25  approval of the search warrant application was not objectively reasonable (at least a reasonable

26  jury could so find) because Officer Cichocki was not under any misconception that "valid" meant

27  verified.  Moreover, Officer Cichocki had more training and experience in these matters than did

28  Officer Ryan.

18

Accordingly, the Court denies Officer Cichocki's motion for summary judgment here as a reasonable jury could find in the Finkelsteins' favor – *i.e.*, it was obvious to anyone with Officer Cichocki's knowledge that the statement at issue was potentially misleading and therefore, by endorsing the statement, Officer Cichocki at the very least recklessly disregarded the truth.

### 2.    "Substantiated" Suspect's Claim

The Finkelsteins also assert judicial deception because of the following statement in the search warrant application: "Skype's response to this subpoena showed the user name 'johnrobbins6' was an account created on 08/16/2015 and the IP address was from Nambia [sic], Africa (*which substantiated the suspect's claim that he was likely using a proxy server*)" (emphasis added).

In their complaint, the Finkelsteins assert that the above statement is problematic because it contains an affirmative misrepresentation – *i.e.*, that the suspect's use of a proxy server had been substantiated when, in fact, that was not the case. *See* Compl. ¶ 11 (alleging that "the suspect's use of a proxy server had not been substantiated"); *see also* Opp'n at (arguing that "the use of a proxy server had not been verified with evidence").  The Finkelsteins maintain that there was

> no evidence that verified that the Namibian IP address used by the perpetrator was in fact from a proxy server. . . . [The officers] never traced the perpetrator's Namibian IP address to a proxy server. Without this false statement, the fact that the IP address was from Namibia, African excluded Plaintiff JOHN FINKELSTEIN, who resided in California, as a suspect.

Compl. ¶ 11; *see also* Opp'n at (arguing that, "in the absence of a proxy server[,] the use of a Namibian IP address to create the Skype account used in the crime would have eliminated Mr. Finkelstein as a suspect").

The problem with the Finkelsteins' affirmative misrepresentation theory is that, as the officers argue, they never claimed they had substantiated the suspect was actually using a proxy server.  Rather, the above statement simply conveyed that a Namibian IP address had been used to create the Skype account and that substantiated the suspect's claim that he was using a proxy server, implicitly because Namibia is a common site for proxy servers.

Recognizing the above problem, the Finkelsteins have now offered an alternative theory in

support of judicial deception – *i.e.*, that there was no factual basis for the "belief that Namibia was a place known to host proxy servers."  Opp'n at 9.  "[T]here was no statistical evidence that verified that proxy servers hosted from Namibia were prevalent in Namibia in 2015 or actually even existed."  Opp'n at 9.  But in his affidavit, Officer Cichocki has explained that there was a factual basis for the statement.  *See* Cichocki Aff. ¶¶ 14-16 (testifying that, "[t]hrough consultation with experienced law enforcement professionals, I was informed that Namibia, Africa is a common location for proxy servers, which mask and make extremely difficult the identification of the actual 'origin' IP address"; referring specifically to consultations with "Detective Patrick Beaver of the LCSO . . . , a detective who had several years of experience in the Northern Virginia/Washington D.C. Internet Crimes Against Children ('ICAC') Task Force" and Dr. Heather Gordon, an FBI Intelligence Analyst).  The Finkelsteins have not offered any evidence to the contrary.  Accordingly, it was not misleading for the search warrant application to indicate that Namibia is a place known to host proxy servers and thus the Namibian IP address did have probative value as to the likelihood that a proxy server was used, as the suspect claimed.

Both officers are entitled to summary judgment as to this aspect of the judicial deception claim.

### 3. Omitting Information re West African Time Zone

Finally, the Finkelsteins argue that there was judicial deception because (1) the officers had in their possession a screenshot of the suspect's Skype user profile, *see* Compl. ¶ 3 (indicating that the screenshot was taken on the victim's phone); (2) the user profile reflected a time zone of "GMT +2"; and (3) the officers omitted from the search warrant application that GMT +2 is the time zone for Namibia.  The Finkelsteins contend that "[t]he fact that the perpetrator's user profile displayed a West African time zone was inconsistent with the theory of probable cause advanced in the RYAN Affidavit that Plaintiff JOHN FINKELSTEIN had created the Skype account from California."  Compl. ¶ 12; *see also* Opp'n at 9 (arguing that the time zone "pointed to someone a continent away from Mr. Finkelstein (who resided in California in the GMT -8 time zone) as the perpetrator").

The officers did not recklessly disregard the truth in omitting the information about the

GMT +2 time zone.  As the officers point out, this is because the search warrant application already noted that the Skype account for "johnrobbins6" was created in August 2015 from an IP address in Namibia, Africa.  *See* Ryan Decl., Ex. E (Ryan Aff. at 6).  Thus, the information about the GMT +2 time zone was essentially duplicative and added nothing to the probable cause calculus.  The display of the GMT +2 time zone was not a real time indicator of the location of the user; it is not disputed that it was a static number first assigned upon registration.[4]

Although not entirely clear, the Finkelsteins seem to argue that the information was not duplicative because, "unlike the IP address[,] detective Ryan could not explain away the West African time zone.  Detective Ryan testified in the state court proceedings that he could not explain how someone from California could have a Skype profile that displayed a West African time zone."  Opp'n at 10.  But the Finkelsteins have not been entirely fair in their characterization of Officer Ryan's testimony, which was as follows:

> Q.  Detective Ryan, do you have a good explanation for how the person you wanted to search in the GMT-minus-eight hours time zone had a Skype profile that displayed the GMT-plus-two time zone?
>
> A.  No.
>
> Q.  So, let me ask you this.  This information, GMT plus two, it comes from Skype; correct?
>
> A.  I would imagine, but I'm not sure.
>
> Q.  It is displayed on the profile from Skype, correct?
>
> A.  Yeah.  I mean, I would imagine that is the case.
>
> Q.  Okay.  And Skype was a big company – is a big company?
>
> A.  Yes.
>
> Q.  Do you believe that information from a big company is reliable information?
>
> A.  Yes.
>
> Q.  Okay.  Do you recall where Skype said the IP address used to

---

[4] At the hearing, the Finkelsteins asserted that it was possible for a user to change the time zone for their user profile.  However, the Finkelsteins have provided no evidence that this happened in the instant case.

United States District Court
Northern District of California

create the account was from?

A. Namibia.

Q. Namibia in Africa, correct?

A. Yes.

Q. Do you know what the time zone in Namibia, Africa was in November when this sexting incident took place?

A. I'm going to guess GMT plus two.

Q. That's a good guess.

Docket No. 126 (Merin Decl., Ex. B) (Tr. at 54-55).

The above testimony indicates, if anything, that Officer Ryan did not even appear to know (until the hearing) that GMT +2 was the time zone for Namibia. *See also* Gordon Decl., Ex. C (Tr. at 56) (Officer Ryan testifying that, before he drafted his affidavit, he did not verify what time zone Namibia was in; "looking at this, this is the first time, to my recollection, that I even noticed the GMT when he brought it up today"). Therefore, Officer Ryan could not have deliberately lied to the state court judge through omission. Furthermore, he did not recklessly disregard the truth either because it was not obvious that GMT +2 was the time zone for Namibia – and even if it were, that would simply be repetitive of the fact that the Skype account was created from an IP address in Namibia.

D. Causes of Action on No Probable Cause (Officer Ryan and Officer Cichocki)

The second, fourth, and fifth causes of action – pled against the individual defendants only – are all claims for no probable cause. The causes of action are as follows:

- Second cause of action: use of untrustworthy information to establish probable cause.

- Fourth cause of action: Use of a search warrant application lacking probable cause on its face to procure a warrant.

- Fifth cause of action: Unreasonable search and seizure without a warrant, without probable cause, and without exigent circumstances.

1. Fourth Cause of Action

The Court's analysis of the claims for no probable cause begins with the fourth cause of

22

United States District Court
Northern District of California

action – *i.e.*, use of a search warrant lacking probable cause on its face to procure a warrant. The Court starts with this claim because that is the claim that the Finkelsteins put at issue when they moved for summary judgment. The Court found in favor of the Finkelsteins on the claim.

That being the case, Officer Ryan and Officer Cichocki cannot reargue that there was probable cause on the face of the warrant; nor are they permitted to submit new evidence related to probable cause as part of the qualified immunity inquiry. Instead, the officers are restricted to the argument of qualified immunity only, and based only on the facts previously presented when the Court considered probable cause. Given these parameters, the Court's qualified immunity analysis on D.D.A. Jangla's prior motion for summary judgment is equally applicable here – *i.e.*, "the facts in the instant case – *i.e.*, that identifying information (such as an email address) provided by a person intent on hiding his identity is likely unreliable – presents an obvious situation where probable cause is lacking." Docket No. 104 (Order at 15). The officers' reliance on D.D.A. Jangla is immaterial here because it was objectively unreasonable for them to rely on the advice of the prosecutor given the obviousness of no probable cause. *Cf. Kelly*, 622 F.3d at 255-56 (in addressing qualified immunity, asking whether officer's reliance on prosecutor's advice was objectively reasonable).

Accordingly, the Court denies the officers' motion for summary judgment on the fourth cause of action.

### 2. Second Cause of Action

The second cause of action is use of untrustworthy information to establish probable cause. As an initial matter, the Court notes that the parties have a dispute as to how to construe the claim. Officer Ryan and Officer Cichocki argue that the claim is really one for judicial deception. *See, e.g.*, Compl. ¶¶ 111, 113 (alleging that the individual defendants "used information which they knew or should have known was untrustworthy to establish probable cause for a warrant"; seeking punitive damages for "the use of judicial deception"). The Finkelsteins argue to the contrary. At the hearing, the Finkelsteins indicated that they asserted this claim based on case law stating that "'[p]robable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or

23

is being committed by the person being arrested.'"  *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009) (citing, *inter alia*, *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)).  They added that any reference to judicial deception with respect to the second cause of action was simply a mistake.

The Court is not unsympathetic to the officers' position, particularly given the allegation contained in the count that the individual defendants *knew* that they were relying on untrustworthy information.  However, the cause of action is also fairly construed as a claim for no probable cause because it contains allegations that the individual officers *should have known* that they were relying on untrustworthy information.  Notably, the Finkelsteins did not assert a reckless disregard of the truth, which would be more akin to judicial deception.

The Court also notes that the second cause of action covers somewhat different ground from the fourth and fifth causes of action which also implicate a lack of probable cause.  The fourth cause of action focuses on a lack of probable cause based on the face of the search warrant application specifically.  In contrast above, the second cause of action to focuses on whether there was probable cause for the search and seizure in San Mateo, independent of what was claimed in the search warrant application.  In short, it asserts a lack of probable cause, irrespective of the facts contained in the search warrant.  The fifth cause of action focuses on whether there was probable cause to search of the Finkelsteins' property after it was taken to Virginia.

Construing the second cause of action as a claim for no probable cause, the Court must address the officers' contention that they are nevertheless entitled to qualified immunity.  Because the Court is not restricted to what was stated on the face of the search warrant application, the Court may consider evidence beyond the four corners of the application, including evidence: (1) that Officer Ryan, in effect, believed that "valid" meant verified; (2) that both officers knew about Mr. Finkelstein's computer science degree and that he was a software engineer; and (3) that, in internet crimes, criminals "often set up accounts, which they intend to use to commit a crime, using variations of their real name" because "[d]oing this helps them organize and remember multiple online accounts and how to access those accounts if passwords are forgotten or lost." Edens Decl. ¶ 13.

Most of the new evidence – *i.e.*, (2) and (3) – is not significant. For example, given that Mr. Finkelstein was experienced with computers, he might well have been able to use a proxy server in Namibia; but with that experience, it would be argued that it is even more unlikely that he would give his "true" email address or use identifying information close to his real name. In short, this evidence does not change the basic analysis that a person intent on hiding his identity (as the suspect did here) would likely not use "true" identifying information (an obvious point, which would therefore bar qualified immunity).

As for the new evidence identified in (1), that affects only Officer Ryan. While Officer Ryan's belief that "valid" meant verified was not obviously deficient under the circumstances such that he cannot be held liable for judicial deception, the analysis is different here. "[P]robable cause exists when under the totality of circumstances known to the [law enforcement] officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *Grant v. City of Long Beach*, 315 F.3d 1081, 1085 (9th Cir. 2002); *see also* Docket No. 104 (Order at 8) (noting that, "[i]n this case, if there was probable cause for a search warrant, there would have been probable cause for an arrest warrant"). Although, in assessing probable cause, a court considers the totality of circumstances known to the law enforcement officer, the probable cause inquiry still turns on an objective analysis – *i.e.*, what a reasonably prudent officer would have done. Similarly, qualified immunity is an objective inquiry, requiring an assessment of whether a reasonable mistake was made. *See Easley v. City of Riverside*, 890 F.3d 851, 855 (9th Cir. 2018) (noting that qualified immunity "is designed to balance 'two important, competing interests: the need to hold public officials accountable for irresponsible actions, and the need to shield them from liability when they make reasonable mistakes'"). Here, whether reasonableness is assessed as a part of probable cause or qualified immunity, a reasonable law enforcement officer would have taken steps to confirm whether Skype had a verification process and would have found out that Skype did not (at least not at the relevant time), in which case probable cause would be lacking. Officer Ryan's subjective belief does not give rise to qualified immunity.

To the extent the officers argue that any unlawfulness of conduct was not clearly

established at the time, thus giving them the protection of qualified immunity, the Court disagrees. As the Court held in conjunction with D.D.A. Jangla's motion for summary judgment, "the facts in the instant case – *i.e.*, that identifying information (such as an email address) provided by a person intent on hiding his identity is likely unreliable – presents an obvious situation where probable cause is lacking" and thus there would be no qualified immunity. *See* Docket No. 104 (Order at 15).

The Court thus finds that qualified immunity does not obtain as to the second cause of action.

### 3.    Fifth Cause of Action

The fifth cause of action, pled against the individual defendants only, is titled "Unreasonable Search and Seizure without a Warrant, without Probable Cause, and without Exigent Circumstances." The factual predicate for the claim is that Officer Ryan and D.D.A. Jangla turned over the Finkelsteins' seized property to Officer Cichocki who then searched the property without, *e.g.*, probable cause in Virginia. *See* Compl. ¶ 124.

According to Officer Ryan, he is entitled to qualified immunity because there is "no case holding that the Fourth Amendment is violated when property seized pursuant to a warrant is transferred to law enforcement in a different jurisdiction that is assisting with the investigation. Moreover, there is no evidence that Det. Ryan participated in the search of Finkelstein's devices in Virginia." Mot. at 25. Neither argument is persuasive. First, on qualified immunity, the Finkelsteins are not complaining about the transfer of the seized property but rather the actual search of the property. Second, although Officer Ryan does not appear to have actually searched any of the property in Virginia, the Finkelsteins' point is that Officer Ryan *enabled* the search of the property in Virginia and thus can be held accountable. *See Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012) (en banc) (with respect to § 1983's causation requirement, stating that "'[a] person "subjects" another to the deprivation of a constitutional right . . . if he [*e.g.*] does an affirmative act [or] participates in another's affirmative acts . . . that causes the deprivation of which complaint is made'"; causation can be "'established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others

1    which the actor knows or reasonably should know would cause others to inflict the constitutional

2    injury'").

3        In his motion for summary judgment, Officer Cichocki makes only the first argument

4    made by Officer Ryan above. For the reasons stated above, that argument has no merit. The

5    Finkelsteins are not complaining about the transfer of the seized property per se but rather its

6    subsequent search.

7    E.    _Monell_ Claim Against the City

8        The only claim brought against the City of San Mateo is the third cause of action. The

9    third cause of action is titled "Use of Untrustworthy Information to Procure a Warrant." In their

10   complaint, the Finkelsteins allege that the City has a "standard" or "practice[]" of preparing and

11   approving search warrant applications that "rely on untrustworthy information provided by

12   internet criminals to online service providers, such as email addresses, to establish probable cause

13   for a warrant without looking into whether the online servicer provider employs safeguards to

14   prevent fraudulent information from being provided." Compl. ¶ 115; *see also* Compl. ¶ 116

15   (referring to the "standard and accepted practices" of the City).

16       Although, in their complaint, the Finkelsteins focused on a policy or practice, they have

17   now clarified their theory of _Monell_ liability, based in part on the Edens declaration that the City

18   Defendants submitted in support of their motion for summary judgment. The Finkelsteins contend

19   that there is a policy or practice based on the City's ratification of Officer Ryan's conduct. The

20   Finkelsteins further assert – based on the Edens declaration – that there is liability based on a

21   failure to train. The City argues that these theories of liability are tendered too late and therefore

22   should not be considered.

23       While the Court is not without some sympathy for the City's position that it is too late to

24   advance these arguments, the posture of the case has changed. The trial date has been vacated

25   because of D.D.A. Jangla's appeal to the Ninth Circuit, and the Court expects the remaining

26   defendants to appeal its qualified immunity rulings herein. Because the trial date has been

27   vacated, the Court shall not preclude the Finkelsteins from asserting new _Monell_ liability theories,

28   especially as the theories seem to have an evidentiary basis (*e.g.*, the failure-to-train theory is

supported by Officer Ryan's and Mr. Edens's declarations regarding Officer Ryan's lack of training on technology-based investigations). The City has ample time to defend and prepare for trial as no trial date has been set.[5] The Court recognizes, however, that, at least for the failure-to-train theory, both parties may need to conduct additional discovery and/or internal investigation or development of the case. The Court therefore shall allow the Finkelsteins and the City to conduct discovery on the failure-to-train theory, and such discovery shall be permitted even though the case is otherwise stayed because of the pending appeal. Discovery shall be completed by July 1, 2019. Because the Court is allowing discovery related to *Monell* liability, the Court denies the City's motion for summary judgment on the *Monell* claim but without prejudice. After discovery is completed, the City may, if it so chooses, file a new motion for summary judgment on the *Monell* claim.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the City Defendants' and Officer Cichocki's motions for summary judgment are granted in part and denied in part. More specifically:

- Officer Ryan is granted summary judgment on the judicial deception claim in its entirety.
- Officer Cichocki is granted summary judgment on the judicial deception claim to the extent it is predicated on the omission "from the RYAN [search warrant] Affidavit [that there was] a Skype text message from the perpetrator admitting that the Skype account was 'FAKE.'" Compl. ¶ 13. Officer Cichocki is also granted summary judgment on the judicial deception claim to the extent it is predicated on the statement in the Ryan search warrant affidavit that the suspect's claim was "substantiated." Finally, he is granted summary judgment on the judicial deception claim to the extent it is predicated on the omission of information about the Namibia time zone. However, Officer Cichocki is denied summary judgment on

---

[5] Even if the trial date had not been vacated, the Finkelsteins would not necessarily be barred from relying on a ratification theory. That theory would not seem to prejudice the City because it appears unlikely that the City would need to do any additional discovery, or even internal investigation or development of the case, to defend against that theory.

the judicial deception claim to the extent it is based on the statement about a "valid" email being "used" to create a Skype account.

- Both officers are denied summary judgment on the fourth cause of action (*i.e.*, no probable cause based on the face of the search warrant), including on qualified immunity.
- Both officers are denied summary judgment on the second cause of action.
- Both officers are denied summary judgment on the fifth cause of action.
- The City is denied summary judgment on the *Monell* claim but the denial is without prejudice to renewal after discovery is taken and further briefing.

This order disposes of Docket Nos. 111 and 118.

**IT IS SO ORDERED**.

Dated: March 5, 2019

_____
EDWARD M. CHEN
United States District Judge